**This order is SIGNED.**


**Dated: December 11, 2015**  _____



**JOEL T. MARKER**
**U.S. Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| In re: | |
|---|---|
| **VECTOR ARMS, CORP.,** | Case No. 15-21039 |
| Debtor. | Chapter 11 |

## MEMORANDUM DECISION

---

Ralph Merrill has been a thorn in Jason Maughn's side since at least January 20, 2012,

when Ralph, Rex Merrill, RGMF Ltd. Partnership, and Vector Arms, Inc. filed a lawsuit in Utah

State Court against Maughn and Vector Arms, Corp. ("Debtor"), essentially alleging that

Maughn fraudulently induced Ralph into transferring control of Vector Arms, Inc.'s assets and

inventory to Maughn and that he breached a contract with Ralph for the purchase of the

business.[1] Though other parties have ostensibly been involved, the dispute that led to this

bankruptcy case and the present motion has always centered on Ralph and Maughn.

---

[1] Also relevant to this motion, the state court complaint sought a restraining order to prevent Maughn from selling or
otherwise disposing of Rex Merrill's personal gun collection, which was stored at the Debtor's place of business.

After years of still-ongoing litigation in state court, Ralph and Maughn's dispute is now in front of this Court in the context of the Debtor's Motion for Contempt Sanctions for Violation of the Automatic Stay against Ralph, Rex, RGMF Ltd. Partnership, Vector Arms, Inc., and Vector Fab, Inc. ("Merrill Parties"), Kelly Enterprises.net, LLC, and Charles Malta ("Motion"). At its core, the Motion can be boiled down to two issues. First, by filing an Amended Complaint in the state court lawsuit, which seeks an order "directing Jason Maughn to vacate the premises at 270 W. 500 N., North Salt Lake, Utah, and turn over all the business assets and records to the control of Plaintiff, and to transfer all ATF regulated inventory to a duly licensed custodial trustee of the Plaintiffs' choosing," did the Merrill Parties seek to obtain possession of property of the estate in such a way that they violated the automatic stay? And second, by adding various non-debtor parties to the Amended Complaint and serving them with a Settlement Letter, did the Merrill Parties commit an act against the Debtor that violated the automatic stay?

On October 7, 2015, the Court held an evidentiary hearing on the Motion, at which counsel for the Debtor and counsel for the U.S. Trustee appeared. Ralph also appeared telephonically, acting *pro se*,[2] but due to his present circumstances he was unable to participate for the entire hearing.[3] None of the other Merrill Parties appeared at the hearing, nor did they file a response to the Motion. Prior to the hearing, Malta and Kelly Enterprises reached a settlement agreement with the Debtor.[4] At the conclusion of the hearing, the Court issued a ruling from the

---

[2] Though the Merrill Parties were represented by counsel at one point in time, counsel has since withdrawn. Ralph has proceeded entirely *pro se* with respect to this motion. Because he is acting *pro se*, this Court must liberally construe his pleadings, but stopping short of acting as his advocate. *See United States v. Pinson*, 584 F.3d 972, 975 (10th Cir. 2009).

[3] At the time of the evidentiary hearing, Ralph was housed in a federal prison camp in Florence, Colorado for crimes unrelated to the bankruptcy proceeding.

[4] *See* Motion to Approve Settlement and Order Approving Settlement at Docket # 101 and # 118, respectively.

bench. On October 14, the Court entered an Order Vacating Bench Ruling and allowed the

Parties until November 13, 2015, to file additional briefing with the Court.[5]

After considering the evidence properly before the Court, assessing the credibility of the

three witnesses, considering the parties' arguments at the hearing, reviewing the post-hearing

briefing, and conducting an independent review of applicable law, the Court issues the following

Memorandum Decision to explain why the Motion will be granted in part and denied in part.[6]

## I. FACTS

To better understand the context of the Motion, it is necessary to review some of the

history of the state court litigation between the parties.  On March 29, 2012, the state court judge

entered an order that, among other things, allowed Maughn and the Debtor to continue to possess

the premises located at 270 W. 500 N., North Salt Lake, Utah, but "with rent to be timely paid

each month [to the state court plaintiffs]."[7] On February 11, 2015, Maughn was scheduled to

appear in the state court to respond to an order to show cause why he should not be held in

contempt of court for allegedly failing to pay rent for three months.[8] On February 11 at 12:15

p.m., just over an hour before the scheduled time of the state court hearing, the Debtor filed this

chapter 11 case. At the hearing on the order to show cause, counsel for Maughn and the Debtor

---

[5] Upon Ralph's Motion to Extend Time to File a Written Response, filed on November 12, the Court extended the time to file the briefing until November 23.

[6] This Memorandum Decision constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, made applicable to this proceeding by Federal Rules of Bankruptcy Procedure 7052 and 9014. Any of the findings of fact herein are deemed, to the extent appropriate, to be conclusions of law, and any conclusions of law herein are also deemed, to the extent appropriate, to be findings of fact, and they shall be equally binding as both.

[7] See Utah State Court Docket in Case # 120700075, Order entered on March 29, 2012. Though the entire state court docket is not in evidence, this Court takes judicial notice pursuant to Fed. R. Evid. 201(b)(2) of the pleadings and documents filed in the state court case, including those that are not shown in the Debtor's Exh. 1.

[8] See Utah State Court Docket in Case # 120700075, Motion filed on December 3, 2014, and Order entered on December 16, 2014.

informed the state court of the bankruptcy filing and asserted that the proceeding was stayed as a

result.[9] On February 12, the state court entered a "case stay," which is reflected on its docket.

On May 18, the Merrill Parties—excluding RGMF Ltd.—filed an adversary proceeding

against the Debtor in this Court, seeking a declaration that the Debtor's inventory and equipment

are not owned by the Debtor, that the Debtor converted assets that belonged to Vector Arms,

Inc., and that the Debtor breached its contract with Vector Arms, Inc. and engaged in fraudulent

activity in doing so.[10] The adversary proceeding involves essentially the same series of events at

issue in the state court case.

On May 26, Ralph, this time acting *pro se*, filed an Amended Complaint in the state court

case ("Amended Complaint"), listing only himself as plaintiff and superficially removing the

Debtor as a defendant.[11] In the Amended Complaint, Ralph adds David Maughan, Paul Fuwell,

Robert Hierz, Tamara Haller, Jeff McNatt, and Malta as defendants along with Maughn. David

Maughan (despite the different spelling of his last name) is Maughn's brother. Fuwell, McNatt,

and Hierz are former employees or officers of the Debtor, though the Debtor employed only

Fuwell as of the bankruptcy petition date.[12] Haller is either the Debtor's former employee or

former outside bookkeeper and payroll accountant.[13] Malta is the President of Kelly

Enterprises.net, LLC, a gun parts supplier and dealer that sold the Debtor's products.[14]

In the Amended Complaint, Ralph alleges the following: that Maughn and Maughan

engaged in a conspiracy to commit fraud against Ralph in connection with the purchase of

Vector Arms, Inc.'s assets and inventory; that Maughn, Fuwell, Hierz, and Haller converted and

---

[9] Debtor's Exh. 6.

[10] Adversary Proceeding # 15-2086, Docket # 1.

[11] Debtor's Exh. 2. In his response to the Motion, Ralph incorrectly asserts that he dismissed the Debtor from the state court case. Though Ralph did not name the Debtor in the Amended Complaint, that is not enough to dismiss the Debtor from the case, and the Debtor is still listed as a defendant on the state court docket.

[12] Debtor's Exh. 10. It is unclear from the record when Hierz and McNatt stopped working for the Debtor.

[13] 10/7/15 Hearing Transcript at 3:12:06 p.m. to 3:12:08 p.m.; *but see* Docket # 77.

[14] Debtor's Exh. 3.

embezzled Ralph's money by using company credit cards for personal expenses, increasing their

compensation without authorization from Ralph, and over-reporting hours worked; that Maughn

and Fuwell engaged in outrageous conduct by betraying Ralph's trust; that Maughn, Fuwell,

Hierz, and McNatt "converted company assets that belonged to [Ralph]"; that Maughn breached

a lease agreement for the building in which the Debtor operates; that Maughn and Malta

converted Rex's firearms collection; that Maughn converted "company vehicles that belonged to

[Ralph]"; and that Maughn interfered with a contract between Ralph and a gun parts

manufacturer. In the prayer for relief, Ralph seeks "[a]n order from the Court directing Jason

Maughn to vacate the premises at 270 W. 500 N., North Salt Lake, Utah, and turn over all the

business assets and records to the control of Plaintiff, and to transfer all ATF regulated inventory

to a duly licensed custodial trustee of the Plaintiffs' choosing," an order requiring Maughn and

Malta to return Rex's firearms collection, and other damages in excess of $3,000,000.[15]

Around the same time that Ralph filed the Amended Complaint, he also sent letters to

Fuwell, Haller, and Malta ("Settlement Letters"),[16] apprising them of the allegations in the

Amended Complaint and offering them an opportunity to settle. Specifically, the Settlement

Letters all contain the following language:

> Please be advised the Amended Complaint has already been filed, but not served
> on you. You can avoid being served a summons and the possibility of being found
> jointly and severally liable, if you are willing to settle individually on the
> Plaintiff's terms, and co-operate by providing a truthful affidavit of all the facts as
> you know them in this case. In short, the Plaintiff would consider removing you
> as a Party Defendant in the lawsuit.[17]

Malta acted quickly after receiving the Settlement Letter. He removed the Debtor's

website, which he controlled, and indicated that the Debtor had been "replaced by Omega

---

[15] Debtor's Exh. 2.

[16] The record does not reflect whether the other new defendants also received similar letters.

[17] Debtor's Exhs. 3, 4, and 5. The Settlement Letter sent to Malta also includes the words "in Utah," before the comma in the first sentence of the quoted language.

Guns."[18] According to Maughn, Malta contacted other dealers and gun manufacturers and told them that the Debtor was going out of business,[19] and he contacted some of the Debtor's employees to tell them that they should no longer work for the Debtor or Ralph would sue them as well.[20] Malta also cancelled a 100-gun contract with the Debtor.[21] Malta's actions caused considerable distraction to Maughn, who was forced to travel to Las Vegas to meet with one of the Debtor's dealers and to Montana to meet with one of the Debtor's suppliers in order to ensure them that the Debtor was still in business.[22] There is no evidence that Ralph had any contact with Malta other than sending him the Settlement Letter, and Ralph denies ever meeting or speaking with Malta.[23]

The combination of Malta's phone calls, the Settlement Letters, and the Amended Complaint caused considerable concern among the Debtor's employees. Five employees quit because they did not want to be a witness or they feared that Ralph would include them in the state court case, even though Fuwell was the only employee at the time who Ralph had added to the Amended Complaint.[24] As a result, the Debtor hired replacement employees at a higher cost and also required existing employees, including Maughn, to take on additional duties. Among the employees who stayed, morale dipped,[25] production quality suffered,[26] and constant phone calls

---

[18] 10/7/15 Hearing Transcript at 3:30:41 p.m. to 3:30:50 p.m.
[19] 10/7/15 Hearing Transcript at 3:42:45 p.m. to 3:42:59 p.m. and 4:10:32 p.m. to 4:10:42 p.m.
[20] 10/7/15 Hearing Transcript at 3:23:34 p.m. to 3:23:42 p.m. A substantial portion of Maughn's testimony regarding Malta's actions was hearsay. Though Ralph did not object to the hearsay, the Court is aware that hearsay is inherently unreliable, and took that into account when considering the testimony.
[21] 10/7/15 Hearing Transcript at 3:19:45 p.m. to 3:20:26 p.m.
[22] 10/7/15 Hearing Transcript at 3:42:44 p.m. to 3:43:15 p.m.
[23] Debtor's Exh. 11.
[24] 10/7/15 Hearing Transcript at 3:23:23 p.m. to 3:23:42 p.m. and 4:31:20 p.m. to 4:31:37 p.m.; *see also* Debtor's Exhs. 9 and 10.
[25] 10/7/15 Hearing Transcript at 4:23:35 p.m. to 4:24:35 p.m. and 4:27:15 p.m. to 4:27:38 p.m.
[26] 10/7/15 Hearing Transcript at 4:09:10 p.m. to 4:09:23 p.m.

regarding whether the Debtor was still in business occupied their time and caused the Debtor to lose sales.[27]

On August 24, the Debtor filed the present Motion. One day later, this Court held a hearing in the adversary proceeding, during which the Court indicated its intent to enter an order to show cause why it should not permissively abstain from conducting the adversary proceeding in favor of the state court litigation. On September 11, the Debtor filed a Motion for Relief from the Automatic Stay to Continue Prepetition Litigation in State Court, in which it requested that the automatic stay be lifted so it could "continue the State Court Lawsuit solely to determine the amount of any claims and counterclaims and the respective rights of the Merrill Parties, Maughn, and the Debtor to the property that the Debtor claims is property of its chapter 11 estate."[28] Ralph filed a response with no objection, and the Court entered an order granting the Debtor's motion on October 2.[29] The parties have since continued to litigate their claims in the state court case.

## II. ANALYSIS

The automatic stay provided under 11 U.S.C. § 362 is one of the most important protections offered to a debtor in bankruptcy. Among other things, the automatic stay prevents "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of [the bankruptcy case]" as well as "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."[30]

---

[27] 10/7/15 Hearing Transcript at 4:29:43 p.m. to 4:31:10 p.m.
[28] Docket # 82.
[29] Docket # 92.
[30] § 362(a)(1) and (3).

Because the Debtor is not an individual and is not covered by the damages provision in

§ 362(k),[31] the Debtor asks the Court to use its authority under § 105(a) to enforce the automatic

stay and sanction the Merrill Parties for their actions. "The Tenth Circuit has held that

bankruptcy courts have civil contempt powers pursuant to § 105(a). A bankruptcy court may

exercise its civil contempt power for violation of the automatic stay so long as doing so is

consistent with the purposes of civil contempt orders *and* doing so is within the limits of the

bankruptcy court's § 105(a) powers. Sanctions for civil contempt must meet one or both of the

following purposes: (1) to compel or ensure compliance with a court order; and (2) to

compensate parties for losses caused by the contemnor's refusal to abide by a court order. Civil

contempt orders should be remedial, not punitive, which is the purpose of criminal contempt."[32]

Unlike an action under § 362(k), which bears a preponderance of the evidence standard,

an action for civil contempt requires that the Debtor prove by clear and convincing evidence that

a valid court order existed, that the Merrill Parties had knowledge of the order, and that the

Merrill Parties disobeyed the order.[33]

The evidence shows that the Merrill Parties, through counsel, first learned of the

bankruptcy case at the state court hearing on the order to show cause held on February 11. The

Merrill Parties also filed an adversary proceeding in the bankruptcy case before Ralph filed the

Amended Complaint in state court. They knew about the bankruptcy case and the automatic stay,

which means that the Debtor has satisfied the first two requirements to obtain an order for civil

contempt. What remains is whether the Merrill Parties' actions violated the automatic stay, and if

---

[31] *See In re Rafter Seven Ranches, L.P.*, 414 B.R. 722, 732-33 (10th Cir. BAP 2009). Although not requested in the Motion, at the evidentiary hearing Debtor's counsel suggested that § 362(k) may be an appropriate section under which to award damages. For the reasons stated in *Rafter*, the Court disagrees.
[32] *In re C.W. Min. Co.*, 477 B.R. 176, 194-95 (10th Cir. BAP 2012) (internal citations and quotations omitted), *aff'd,* 749 F.3d 895 (10th Cir. 2014).
[33] *Reliance Ins. Co. v. Mast Constr. Co.*, 159 F.3d 1311, 1315 (10th Cir. 1998).

so, what sanctions are appropriate for their actions.

**A. The Merrill Parties Other than Ralph**

There is no evidence that any of the Merrill Parties other than Ralph were involved in filing the Amended Complaint or sending the Settlement Letters that are the basis for the Debtor's Motion. The heading of the Amended Complaint names Ralph as the sole plaintiff, acting in his personal capacity. At the evidentiary hearing, the Debtor argued that the Amended Complaint contains a number of allegations that Ralph could bring only in his capacity as president of Vector Arms, Inc. or RGMF Ltd. But the Amended Complaint characterizes the issues as personal disputes between Ralph and the various defendants, and the Debtor presented no evidence to show that Ralph acted on behalf of Vector Arms, Inc., Vector Fab, Inc., or RGMF, Ltd.[34] The Settlement Letters also show Ralph as the sole signatory and make no mention of the other Merrill Parties. Nor is there evidence that Rex took any adverse action against the Debtor or that Ralph had any authority or direction to act on Rex's behalf. In sum, there is no clear and convincing evidence that Vector Arms, Inc., Vector Fab, Inc., RGMF, Ltd., or Rex took any action in contempt of the automatic stay, and the Motion is DENIED as to those parties.

**B. Ralph Violated the Automatic Stay by Seeking Control of the Debtor's Property Via the Amended Complaint**

As previously mentioned, the automatic stay prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."[35] Property of the estate includes "all legal or equitable interests of the debtor in property

---

[34] It is unclear whether Ralph even had authority to act on behalf of RGMF Ltd., which Maughn described at the hearing as the "Merrill Kids." 10/7/15 Hearing Transcript at 4:14:06 to 4:14:12. RGMF Ltd.'s proof of claim # 8-1, which includes a copy of the lease, shows that Jenny Hawke is RGMF Ltd.'s general partner and general manager.
[35] § 362(a)(3).

as of the commencement of the case."[36] As the Tenth Circuit has stated, "[t]he scope of § 541 is

broad and should be generously construed; an interest may be property of the estate even if it is

novel or contingent."[37]

The Amended Complaint seeks "[a]n order from the Court directing Jason Maughn to

vacate the premises at 270 W. 500 N., North Salt Lake, Utah, and turn over all the business

assets and records to the control of Plaintiff, and to transfer all ATF regulated inventory to a duly

licensed custodial trustee of the Plaintiffs' choosing."[38] Under § 541, the Debtor's lease interest

in the North Salt Lake building is property of the estate; the state court entered an order

affirming the Debtor's right to possess the building, and notwithstanding the Debtor's admitted

failure to pay rent, the state court has not vacated or otherwise overturned its earlier order.[39] The

Debtor also possesses and controls the "business assets and records" and "ATF regulated

inventory" that Ralph seeks to control in the Amended Complaint.[40] By filing the Amended

Complaint, Ralph attempted to obtain possession or control of property of the estate.

Ralph argues that the Debtor does not own the property in question, and thus the

Amended Complaint does not actually seek to obtain possession of property of the estate. The

question of who owns the assets and inventory is obviously disputed and will be decided in the

state court case. But even if the state court eventually determines that Ralph owns the disputed

property, Ralph's argument ignores the effect of § 541, and for that reason it fails. Ralph violated

the automatic stay.

---

[36] § 541(a)(1).

[37] *Parks v. FIA Card Servs., N.A. (In re Marshall)*, 550 F.3d 1251, 1255 (10th Cir. 2008) (citing *Baer v. Jones (In re Montgomery)*, 224 F.3d 1193, 1194 (10th Cir. 2000)).

[38] Debtor's Exh. 2.

[39] *See* Utah State Court Docket in Case # 120700075, Order entered on March 29, 2012; Debtor's Schedule G, Docket # 27.

[40] Debtor's Schedule B, Docket # 27.

**C. Ralph Did Not Violate the Automatic Stay by Adding Non-Debtor Parties to the**

**Amended Complaint**

The automatic stay also prohibits "the commencement or continuation . . . of a judicial,

administrative, or other action or proceeding against the debtor that was or could have been

commenced before the commencement of [the bankruptcy case]."[41] The Debtor argues that by

adding related but non-debtor parties to the Amended Complaint, Ralph really sought to harm

the Debtor and violated the automatic stay.

By its terms, the automatic stay applies only to the Debtor and does not prevent actions

against non-debtor principals, officers, employees, and other related parties.[42] However, using

their authority under § 105(a), courts have extended the protection of the automatic stay to non-

debtors in "unusual situations" such as "when there is such identity between the debtor and the

third-party defendant that the debtor may be said to be the real party defendant and that a

judgment against the third-party defendant will in effect be a judgment or finding against the

debtor."[43] With that in mind, the Debtor's Motion has two significant problems.

First, the Motion does not seek to extend the automatic stay to non-debtor parties; it

requests sanctions against Ralph for adding non-debtor parties to the Amended Complaint. This

is a problem because "although the stay provided by 11 U.S.C. § 362(a) is automatic as to the

debtor, it is not automatic as to others. Unless the bankruptcy court expressly extends the stay to

others, it applies by its literal terms only to the debtor."[44] The distinction is important, because

unlike the automatic stay in § 362(a), "[t]he party seeking to invoke an extension of the stay

---

[41] § 362(a)(1).

[42] *See Okla. Federated Gold and Numismatics, Inc. v. Blodgett*, 24 F.3d 136, 141 (10th Cir. 1994).

[43] *Id.* (quoting *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986)).

[44] *Fisher Sand & Gravel Co. v. W. Sur. Co.*, No. CV09-727 WPL/RLP, 2009 WL 4099768, at *4 (D.N.M. 2009)
(citing *C.H. Robinson Co. v. Paris & Sons, Inc.*, 180 F.Supp.2d 1002 (N.D. Iowa 2001)).

[under § 105(a)] must affirmatively seek an order from the bankruptcy court."[45] Having failed to

do so, the Debtor is effectively asking the Court to sanction Ralph for violating a stay—as to the

non-debtor parties—that did not exist.

Second, even if the Court could somehow retroactively extend the stay to the non-debtor

parties, there is insufficient identity of interest between the Debtor and non-debtor parties to

justify extending the stay. The Debtor acknowledged that Hierz, Haller, and McNatt were

already former employees or contractors of the Debtor by the time it filed for bankruptcy relief.

They have nothing to do with the Debtor's current operations or attempt to reorganize. Fuwell is

also a former employee, though he was employed by the Debtor when Ralph added him to the

Amended Complaint and sent him the Settlement Letter. With that said, Ralph's claims against

Fuwell are not claims against the Debtor. Though Ralph's claims arise out of Fuwell's

employment, first with Vector Arms, Inc. and then with the Debtor, Ralph does not raise

*respondeat superior* or any other legal theory to impute liability to the Debtor. Whether or not

the claims against the former employees are meritorious, the evidence does not show that any of

the former employees have such an identity of interest with the Debtor that Ralph violated the

automatic stay by adding them to the Amended Complaint.

The other new defendants, Malta and Maughan, also lack a sufficient nexus to the Debtor

to support a finding that adding them to the Amended Complaint was really an act against the

Debtor. The Debtor has never employed or done business with Maughan. The only apparent

connection the Debtor has with Maughan is that he is Maughn's brother, and allegedly helped

Maughn purchase Vector Arms, Inc.'s assets and inventory from Ralph. It is possible that the

claim against Maughan was another blow in Ralph's personal dispute with Maughn; but Maughn

is not the Debtor, and a claim against his brother is not protected by the automatic stay.

---

[45] *C.H. Robinson Co.*, 180 F.Supp.2d at 1018.

As the president of one of the Debtor's now-former vendors, Malta is more connected to

the Debtor's business than Maughan. But as with Maughan, Ralph's claim against Malta has

little to do with the Debtor. The Amended Complaint alleges that Malta bought Rex's personal

gun collection from Maughn, knowing that the gun collection had been stolen. Ignoring Ralph's

questionable standing to bring a claim on Rex's behalf, the claim involves an alleged transaction

that is completely separate from the Debtor and its business. To sanction Ralph for suing Malta

based on a transaction involving assets never owned by the Debtor would be to extend the

protection of the automatic stay to a degree that is not supported by the language of the statute or

any case law that this Court is aware of. The Court is unwilling to make that leap.

## D. Ralph Did Not Commit the Other Complained-of Acts

The Motion also seeks sanctions for "contacting and harassing the Debtor's current

employees and threatening to name them in the Utah State Court lawsuit if they continued to

work for the Debtor" and "using the Amended Complaint and other means to coerce Malta to

transfer the Debtor's internet domain name, www.vectorarms.com, which was controlled by

Malta, to the Merrill Parties."[46]  But according to Maughn it was Malta, not Ralph, who

contacted the Debtor's employees and told them that they would be added to the state court

lawsuit. There is also no evidence to show that Ralph coerced Malta into transferring the

Debtor's internet domain name. Based on the Debtor's settlement agreement with Malta, which

requires Malta to transfer the domain name "vectorarms.com" to the Debtor,[47] it appears that

Malta retained control of the Debtor's domain name and removed the website on his own. Ralph

cannot be held liable for Malta's actions simply because he added Malta to the Amended

Complaint, an act that did not violate the automatic stay.

---

[46] Motion, at 2.
[47] Docket # 118.

**E. Damages**

The Debtor requests actual and punitive damages against Ralph for his contempt of court. To begin with, "[c]ivil contempt orders should be remedial, not punitive, which is the purpose of criminal contempt."[48] Accordingly, the Debtor's request for punitive damages is denied.[49]

Turning next to actual damages, the Debtor asserts that it sustained $213,274.39 in actual damages as a result of the Merrill Parties' actions. "In a civil contempt proceeding, once a plaintiff has established the elements of contempt by clear and convincing evidence, it need only prove damages by a preponderance of the evidence."[50] Before proceeding further, it is helpful to reiterate that Ralph committed contempt only by continuing his effort to obtain possession and control over property of the estate via his request in the Amended Complaint, which violated the automatic stay. Thus, any damages that arise from the other complained-of acts—in particular, adding the new defendants to the Amended Complaint and serving them with the Settlement Letters—do not arise out of a violation of the automatic stay and should be denied.

At the hearing, and in conjunction with Maughn's testimony, the Debtor presented a demonstrative exhibit that categorizes the actual damages as follows: $202.92 for time spent meeting with Haller, Hierz, and McNatt as well as the travel costs associated with those meetings;[51] $386.57 for expenses incurred in traveling to meet with a dealer in Las Vegas for the purpose of ensuring the dealer that the Debtor was still in business; $295.90 for replacement

---

[48] *In re C.W. Min. Co.*, 477 B.R. at 195; *see also Reliance Ins. Co. v. Mast Constr. Co*, 84 F.3d 372, 377 (10th Cir. 1996).
[49] Even if punitive damages may be awarded in civil contempt motions, the Debtor failed to show that they should be awarded. In deciding whether to award punitive damages for violating the automatic stay in the context of § 362(h), courts generally look to "(1) the nature of the defendant's conduct; (2) the defendant's ability to pay; (3) the motives of the defendant; and (4) any provocation by the debtor." *Diviney v. NationsBank of Tex., N.A. (In re Diviney)*, 225 B.R. 762, 777 (10th Cir. BAP 1998). Here, the majority of Ralph's conduct did not violate the automatic stay, there is no evidence of Ralph's ability to pay, and his motives are unclear.
[50] *Reliance Ins. Co.*, 159 F.3d at 1318.
[51] 10/7/15 Hearing Transcript at 3:44:55 p.m. to 3:44:57 p.m.

domain names the Debtor was forced to purchase after Malta removed its website;[52] $58,290 for

net profit lost on a 100-gun contract that Kelly Enterprises canceled after Ralph filed the

Amended Complaint; $136,125 for other combined net profit losses that were caused by damage

to production and sales from the loss of employees, decrease in employee morale, distraction

caused to management, loss of business reputation and confidence, and interruption of brand

presence online and in dealerships; and $17,974 for attorney's fees.

As previously explained, Ralph did not violate the automatic stay by adding the former

employees to the Amended Complaint, and for that reason the Court denies the Debtor's request

for damages incurred in meeting with those employees to discuss the Amended Complaint.

The next three items—the Las Vegas meetings, the domain name purchases, and the

canceled contract—all consist of damages that arose out of Malta's actions, not Ralph's, and will

be denied accordingly. Though the record does not reflect exactly why the Las Vegas dealer

believed that the Debtor was out of business, Maughn testified that multiple dealers thought that

the Debtor had been "bought out by a company in Florida"[53] and that Malta changed the

Debtor's website to say that "Vector had been replaced by Omega Guns."[54] Presumably then, it

was the changed website that caused the Las Vegas dealer to believe that the Debtor had gone

out of business.[55] At the very least, there is no evidence to show that Ralph contacted the Las

Vegas dealer. Similarly, Malta's actions with the website were the reason the Debtor was forced

to purchase additional domain names. As for the canceled contract, Maughn testified that he

overheard Malta say "he was doing it to help Ralph"[56] in response to the Amended Complaint.

---

[52] 10/7/15 Hearing Transcript at 3:45:05 p.m. to 3:45:38 p.m.
[53] 10/7/15 Hearing Transcript at 3:32:35 p.m. to 3:32:51 p.m.
[54] 10/7/15 Hearing Transcript at 3:30:42 p.m. to 3:30:50 p.m.
[55] Though not in evidence, Maughn's Declaration in Support of the Motion states that "Malta contacted various of Vector's dealers and customers and told them that the Debtor was not going to be around much longer and, therefore, they should stop doing business with the Debtor." Docket # 77.
[56] 10/7/15 Hearing Transcript at 3:32:05 p.m. to 3:32:07 p.m.

But there is no evidence that Ralph asked Malta to cancel the gun contract with the Debtor, or even that Ralph knew the contract existed. Because there is no evidence that Ralph's violation of the automatic stay led to the Las Vegas meetings, the website purchases, or the canceled contract, damages for all three items are denied.

The damages for the other combined net profit losses is based on the Debtor's plan to ramp up production and distribution, which the Debtor alleges was delayed by approximately nine months by the actions of Malta and the Merrill Parties. According to Maughn, the Debtor intended to increase its production to 55-60 units per month,[57] which was less than half of its peak prepetition production of well over 100 units per month,[58] but more than the 48 units per month the Debtor was producing as of the petition date.[59] Maughn testified that the Debtor would receive an average net profit of $550 per unit if it achieved its increased production and distribution goals.[60] In reaching the $136,125 number, the Debtor discounted its expected net profits during the nine-month delay by 50 percent.

The Court will not award the Debtor any combined net profit damages for several reasons. First, to the extent that Ralph's continuation of the state court lawsuit created a distraction to management that caused any of the alleged net profit losses, those damages are mitigated by the Debtor's own request for relief from the automatic stay to continue the state court lawsuit.[61]

Second, the evidence and testimony do not demonstrate that *Ralph's* violation of the automatic stay led to the Debtor's delayed production. According to Maughn, the loss of

---

[57] 10/7/15 Hearing Transcript at 3:47:07 p.m. to 3:47:10 p.m.
[58] 10/7/15 Hearing Transcript at 3:49:20 p.m. to 3:49:29 p.m.
[59] 10/7/15 Hearing Transcript at 3:02:02 p.m. to 3:02:22 p.m.
[60] 10/7/15 Hearing Transcript at 3:47:55 p.m. to 3:48:20 p.m.
[61] The Debtor presented no evidence to show that Ralph's attempt to gain control of the Debtor's property, the only act that violated the automatic stay, caused Maughn any real distraction.

employees and reduced morale resulted from Ralph adding Fuwell and Maughan—neither of

whom was protected by the automatic stay—to the Amended Complaint and from Malta calling

the employees to warn them to quit.[62] The loss of reputation and brand presence, both online and

with dealers, resulted from Malta removing the Debtor's website and calling the Debtor's

dealers. In other words, it was Malta's repeated violations of the automatic stay that caused most,

if not all, of the alleged damages.

Finally, the alleged damages are simply too speculative based on the Debtor's past

performance. In 2013, the Debtor reported $1,214,323 in gross sales, but netted a profit of just

$4,063 for the year.[63] In 2014, the Debtor achieved $643,557.29 in sales, but suffered a net loss

of $51,996.74 for the year.[64] According to the monthly operating reports filed in this case, the

Debtor earned cash profits of $2,399.74 in March, $2,685.91 in April, $458.16 in June, and

$426.43 in July.[65] The Debtor suffered net losses of $370.07 in May and $2,621.94 in August.[66]

The Debtor's cash profits during the case must be further discounted by about $4,000 per month,

considering that the Debtor has not made a building lease payment to the landlord since at least

the petition date.[67] At no point since 2013 has the Debtor achieved or even come close to the

profits it claims it would make in the nine-month period for which it seeks damages. And while

the Debtor had plans to ramp up production and sell through a new distributor, "RSR," it

presented no evidence to show that it had a pre-existing contract or definite agreement with RSR.

---

[62] 10/7/15 Hearing Transcript at 3:21:50 p.m. to 3:23:46 p.m. Jeremy Mochau, one of the Debtor's former
employees, also submitted a declaration in which he states that he and other employees left the Debtor because they
did not want to be sued by the Merrill Parties. Debtor's Exh. 9.
[63] Docket # 8.
[64] Docket # 9.
[65] Debtor's Exhs. 13-14 and 16-17.
[66] Debtor's Exhs. 15 and 18.
[67] 10/7/15 Hearing Transcript at 4:10:45 p.m. to 4:11:10 p.m. Maughn estimated that rent payments were
approximately $4,000 per month, though proof of claim # 8-1 shows that they are $4,167 per month.

The Debtor's aspirations for sales and profits are an insufficient basis on which to award damages.

The Debtor also seeks attorney's fees of $17,974 for time expended to redress the violations of the automatic stay. Counsel incurred some of the fees in response to Malta's violations of the automatic stay, so it would not be appropriate to award those fees as damages against Ralph.[68] However, counsel expended a substantial amount of time responding to the Amended Complaint, drafting the Motion, and preparing for the hearing, and an award of those fees is an appropriate sanction.[69] Counsel also expended time that mixed work related to both Ralph's and Malta's violations of the automatic stay, and those fees will be awarded with a 50 percent discount.[70] Taking into account the above-explained reductions, the Court finds it appropriate to award an equivalent of 52 hours of billed time at $265 per hour, for a total of $13,780, as a sanction for Ralph's violation of the automatic stay.

### III. CONCLUSION

Counsel for the Debtor characterized Ralph's litigation strategy as a war of attrition. That is probably correct, though Maughn, not the Debtor, is Ralph's primary target. Without counsel to focus his efforts, Ralph's attempt to obtain control of the Debtor's property proved to be his undoing in this particular battle, as he failed to recognize the combined effect of §§ 541 and 362 of the Bankruptcy Code. With that said, only the Debtor is protected by the automatic stay, and

---

[68] The Court finds that time entries on 8/31/15, 9/1/15, 9/9/15, and 9/14/15 relate solely to Malta's violation of the automatic stay and will not be awarded against Ralph. In addition, entries of 1.5 hours on 8/22/15; 1.0 hours on 8/23/15; .5 and .2 hours on 9/16/15; .3 hours on 9/17/15; .3 hours on 9/18/15; .3 and .2 hours on 9/21/15; .2 hours on 9/23/15; and 1.6 and .8 hours on 9/24/15 relate solely to Malta's violation of the automatic stay and will not be awarded against Ralph.

[69] Time entries on 6/29/15, 7/29/15, 8/24/15, 9/28/15, 9/29/15, and 9/30/15, as well as expenses related to the motion, are awarded in their entirety. Entries of 1.4, 1.1, and .5 hours on 8/22/15; 2.1, .3, 1.8, .3, .3, .8, and .5 hours on 8/23/15; 1.3, 1.8, and .3 hours on 9/16/15; 1.0, .9, and .2 hours on 9/22/15; 2.3 hours on 9/23/15; and .4 hours on 9/24/15 are also awarded.

[70] Entries in this category are .5 hours on 9/16/15; .4 and .2 hours on 9/17/15; 1.6 and .3 hours on 9/18/15; .1, .7, .6, .4, and .3 hours on 9/21/15; .4, .6, and .2 hours on 9/22/15; and .4, .3, and .4 hours on 9/23/15.

Ralph does not deserve to be sanctioned under § 105(a) for suing non-debtor parties. For the

reasons explained above, the Debtor is awarded $13,780 in damages for Ralph's violation of the

automatic stay, but the Motion is otherwise DENIED. The Court will issue a separate order in

accordance with this Memorandum Decision.

---------------------------------------------- END OF DOCUMENT ---------------------------------------

_____ooo0ooo_____

## SERVICE LIST

Service of the foregoing **MEMORANDUM DECISION** will be effected through the Bankruptcy Noticing Center to each party listed below.

Brian M. Rothschild
Parsons Behle & Latimer
201 S. Main St., Suite 1800
Salt Lake City, UT 84111
        *Counsel for Debtor*

Ralph Merrill
3617 South 400 East
Bountiful, UT 84010

Rex Merrill
8695 Gravel Hills Dr.
Sandy, UT 84094

RGMF Ltd. Partnership
c/o Ronald George
389 N. Mink Creek Rd.
Pocatello, ID 83204

Vector Fab, Inc., as Successor to Vector Arms, Inc.
c/o Ronald George
389 N. Mink Creek Rd.
Pocatello, ID 83204